## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

### Case No. 9:24-cv-80640-Cannon

| | |
|---|---|
| **RABBI NAFTALY HERTZEL, HENYA HERTZEL, and CHABAD ISRAELI CENTER, INC., a Florida not-for-profit corporation,** | |
| **Plaintiffs** | |
| **vs.** | |
| **LOGGERS' RUN, INC., a Florida not-for-profit corporation, CAMPBELL PROPERTY MANAGEMENT AND REAL ESTATE, INC., RONALD HARP, and HARRY DIETZ,** | |
| **Defendants.** | |

## FIRST AMENDED COMPLAINT

Plaintiffs Rabbi Naftaly Hertzel, Henya Hertzel, and Chabad Israeli Center, Inc. (collectively, the "Hertzels"), in the above styled cause, sue Loggers' Run Association, Inc. ("Loggers' Run" or the "HOA"), Campbell Management and Real Estate, Inc. (the "Management Company"), Ronald Harp ("Harp"), and Harry Dietz ("Dietz").

### NATURE OF THE CASE

1.      This action arises out of a campaign by the HOA, Harp, Dietz, and other members of the HOA Board of Governors (the "HOA Board") to discriminate against the Hertzels and, more broadly, to slow the growth of Jews within the Loggers' Run planned residential community. Defendants engaged in this campaign by hindering the efforts of the Hertzels to foster a Jewish community in the area and by retaliating against the Hertzels for exercising their rights to do the same.

1

2554ab17f586b1ae

2.      The campaign began when the Hertzels began exploring the possibility of constructing a synagogue within Loggers' Run, which they proposed locating near multiple similarly situated churches attended by HOA board members and residents. This synagogue is essential to the growth of the Orthodox Jewish community within Loggers' Run because central tenets of that faith prohibit driving to religious services on the Sabbath and Jewish holidays. Members of the HOA Board intervened to prevent the HOA from even considering the Hertzels' proposal to construct a synagogue within the community. Although the HOA would eventually muster pretextual reasons for the rejection, individual members of the HOA and its agents were shockingly honest, explaining that the HOA "didn't want Jews" in Loggers' Run and, more recently, that a synagogue would be constructed over then-HOA Board President Harp's "dead body."

3.      When the Hertzels and Jewish community of Loggers' Run pivoted to seeking election to the HOA Board, the HOA, Harp, and others responded by consistently acting to prevent their election. When the Jewish candidates arrived at the election meeting with enough proxy votes to secure seats on the HOA Board, the HOA and incumbents on the Board, including Harp, functionally cancelled the election by leaving the meeting and denying a quorum, leading the HOA's representative to declare the election postponed until the next year. In later elections, Harp and other HOA Board members whipped residents of Loggers' Run into an antisemitic frenzy by openly campaigning against electing Jews, sending letters asking residents to "read between the lines," and warning residents that the "Jews are trying to take over."

4.      Unable to build a synagogue, the Hertzels purchased property near their house with the intent to house an assistant Jewish rabbi and use the house for in-home religious services and events for the community. The HOA and its board members quickly retaliated with a withering fusillade of citation warnings for purported rule violations that were not enforced against similarly

situated residents. The HOA also preemptively threatened the Hertzels with legal action if they hosted Jews at their house for prayer and service, and withheld approval from the Hertzels for developing the house in a manner that would facilitate hosting Chabad events and, thus, housing a Jewish rabbi. The Hertzels eventually concluded that the HOA had rendered their plans for the house practically and financially unfeasible. Less than a year after purchasing the house, the Hertzels decided to sell it.

5.       Defendants backstopped their opposition to the Hertzels with a broader campaign of retaliation and selective enforcement. The HOA, the Management Company, Harp, and Dietz have repeatedly attempted to enforce trivial HOA rules against the Hertzels for purported violations that they have not enforced against similarly situated neighbors, citing the Hertzels, for example, for having unauthorized religious structures on their lawn; for the material used to maintain their driveway; and for the way the Hertzels paint their mailbox, move their trash, and mow their lawn. They have denied the Hertzels access to community spaces and resources such as community message services and participation in HOA meetings. And they have repeatedly interfered with the Hertzels' attempts to host religious gatherings at their home by calling the police during events.

6.       As with their synagogue and election efforts, Defendants have been remarkably open about their motivations for oppressing the Hertzels and other Jews in the community. Norman Defusco, ("Defusco") a member of the HOA Board, described the Hertzels' attempt to submit a notice to the community newsletter as a situation where "the Jews were trying to get a freebie." Dietz told the Hertzels that "they should have ended your kind in the 1930s." And Harp continued to campaign through the neighborhood warning that "the Jews are trying to take over."

7.       Given the HOA's influence within the community, Defendants' antisemitic campaign against the Hertzels and Jews has unsurprisingly instigated others in the community.   Other

residents of Loggers' Run have shouted antisemitic invective outside of the Hertzels home, including "heil Hitler" and that "Jews should be exterminated." The Hertzels' meeting places for their congregation have been repeatedly vandalized. The windows and religious symbols have been broken, and the outside has been spraypainted. Residents have threatened to run Jewish residents over as they play outside with their children. And residents have joined the HOA in calling the police to disrupt gatherings hosted by the Hertzels with other Jewish congregants.

8.     The environment in Loggers' Run is so hostile to the Hertzels that the State of Florida awarded them a grant funding home protection, including to install security systems, cameras, impact windows, and a gate. The HOA resisted even these measures by attempting to deny approval for the developments.

9.     Defendants' campaign and these incidents have only amplified since the horrific massacre of over 1,200 people in Israel on October 7, 2023. This exacerbation tracks a global and national spike in antisemitic attacks over the past year.

10.     Like many Jews, the Hertzels are not newcomers to antisemitic hate. But Defendants' campaign against them has left them and their children afraid in their own home. Their children are afraid to play outside and fear when cars drive past their home. Their youngest daughter cannot sleep alone. The conditions in the community have rapidly deteriorated in recent months, and the Hertzels fear that the environment in Loggers' Run will continue to deteriorate in the current climate without court intervention or a change of heart by the HOA.

11.     Federal and Florida civil rights law do not tolerate Defendants' brazen campaign against Plaintiffs. Their conduct is unlawful and actionable under 42 U.S.C. § 1982, the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, and the Florida Fair Housing Act, Fla. Stat. § 760.20 *et seq.* Plaintiffs respectfully bring suit to enforce their rights under these statutes.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367, and 1343. This action arises under the laws of the United States. This Court has authority to render compensatory, punitive, declaratory, and injunctive relief in this action, including under 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 1343, 1982, 1988, and 3613.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and 1391(b)(2). Palm Beach County is where the causes of action alleged herein accrued, where the parties reside, and where a substantial portion of the events giving rise to the claim occurred.

## PARTIES

14.     Plaintiff Chabad Israeli Center ("the Chabad") is a Florida not-for-profit organization. The Chabad is dedicated to serving the Florida Jewish community through a variety of initiatives, including (but certainly not limited to) religious services and programs, education for children and adults, women's groups, children's programs, acclimation programs for new immigrants, translation services to assist Jewish residents with applications for assistance, cultural preservation programs, and a wide range of charity initiatives.

15.     The Chabad typically meets at 11443 West Palmetto Park Road in Boca Raton, Florida 33428, a storefront within the Loggers' Run planned community. The property is owned and managed by a third-party company. The Chabad provides regular synagogue services.

16.     The Chabad was founded by Plaintiffs Rabbi Naftaly Hertzel and Rebbetzin Henya Hertzel.

17.     The Hertzels are ethnically Jewish and adhere to the Orthodox Jewish faith.

18.     Rabbi Hertzel was born and raised in Israel and received rabbinical ordination at Beit Midrash L'Rabanut of Greater Fort Lauderdale. Rabbi Hertzel currently serves as the President

and director of the Chabad, where he ministers to the Loggers' Run community as its only local rabbi and to the Israeli community at large in Boca Raton.

19.     Henya Hertzel is the wife of Rabbi Hertzel. Henya Hertzel attended Bais Chana Seminary in Tzvat, Israel and has taught Judaic Studies and Hebrew at Jewish day schools. She serves as the Vice President and co-director of the Chabad. She operates the Chabad's programs.

20.     The Hertzels are residents of Loggers' Run and currently reside with their five children at 21812 Reflection Lane in Boca Raton, Florida 33428. The Hertzels have lived at this address during all times relevant to this suit.

21.     From July 2021 to April 2024, the Chabad owned the property and land at 21813 Reflection Lane, Boca Raton, Florida 33428, which is also within the Loggers' Run community.

22.     Defendant Loggers' Run is a Florida not-for-profit corporation with its principal place of business in Palm Beach County, Florida. It is the homeowners' association, as defined in Fla. Stat. § 720.301, responsible for the operation of the Loggers' Run community.

23.     Defendant Loggers' Run has authority to regulate various aspects of the Loggers' Run community, including to regulate a broad array of decisions regarding how property owners in the community engage in home improvement, maintenance, land use, and other decisions related to their property. The HOA likewise governs the use, improvement, and maintenance of common areas within the community and controls a wide range of community services and resources, including a messaging service. The HOA has authority to enforce its rules by levying fines, pursuing legal action, and taking other adverse actions against residents in Loggers' Run. The HOA also directs community events and engagement through a variety of initiatives and programs.

24.     Agreeing to adhere to the HOA's rules and receiving the right to enjoy the benefits of the HOA are terms and conditions of the sale and use of property in Loggers' Run.

25.     Defendant Campbell Property Management and Real Estate, Inc. is a Florida corporation that conducts business in Palm Beach County, Florida. The Management Company is contracted by the HOA to manage Loggers' Run. The Management Company had actual notice of the discriminatory conduct of its agents at Loggers' Run.

26.     Defendant Ronald Harp is the current Vice President and former President of the Board of Governors of the HOA. In these capacities, Harp had authority over HOA rule enforcement and board operations.

27.     Defendant Harry Dietz is a member of the HOA's Board of Governors and was previously employed by the Management Company as assistant manager in the Logger's Run Community. In these capacities as a Board member, Management Company agent and employee, Dietz acted in the course of his employment in a managerial capacity with authority over HOA rule enforcement and board operations.

28.     Harp, Dietz, and the other board members of the HOA are influential members of the community by virtue of their positions with the HOA.

29. On information and belief, Harp and Dietz had actual knowledge that federal and Florida law prohibited discriminating against residents on the basis of race and religion; that Florida law mandates that housing covenants that restrict the "use of any real property" on the basis of race or religion are unenforceable; and that their conduct alleged in this Complaint violated federal and Florida law.

30.     The Declaration of Protective Covenants and Restrictions for Loggers' Run ("Declaration"), Ex. G, mandates that the HOA "will conform to and observe all laws, statutes, ordinances, rules and regulations of the United States of America, the State of Florida, the County

and any and all other governmental and public authorities and boards or officers of the same related to such Committed Property, any improvements thereon, or the use and the same thereof."

31. Harp and Dietz certified that they had reviewed the Declaration and would uphold its provisions, including its requirement to observe appropriate federal and state laws.

32. Defendants each have sufficient experience in the housing industry to know that racial and religious discrimination in housing and living decisions is unlawful under federal and Florida law.

## FACTUAL ALLEGATIONS
### The HOA's Land-Use Documents

33. Defendants enforce a set of governing documents that regulate homeowner conduct, property use, and property development. These documents include the Declaration and the HOA's "Rules and Regulations of Loggers' Run, Inc." ("Rules"). Ex. H.

34. The Declaration defines "Commercial Area" as "the portions, if any, of the Committed Property which may be utilized for commercial, business, school, church, or other uses or any other commercial or public and semi-public facilities which may be so utilized in accordance with the zoning regulations of the County provided such uses are not prohibited by this Declaration, a Replat or a Replat Declaration."

35. The Declaration details "land use classifications and restrictions" that apply to the community, one of which is a commercial ban, which states that "no Commercial Areas shall be established nor maintained on any Residential Property or in any Recreation Area. However, as to all portions of the Total Property other than the Residential Property and Recreation Areas, the Developer reserves the right, subject only to applicable zoning regulations of the County, to designate and provide for the establishment and operation of Commercial Areas."

36. The Declaration states that "[n]o commercial or business occupations may be carried on in the Residential Property" except for services related to the construction or maintenance of dwellings—that is, no home can be used for religious purposes.

37. The HOA's Rules amplify the effect of the commercial ban, prohibiting any "commercial or business use of any portion of the Residential Property," including inside homes, except "home occupations."

38. "Home occupations" are narrowly circumscribed under the Rules. Among other requirements, any "activities of a home occupation [must] occur entirely within the" house; only one person not part of the immediate family "may assist in the operation of the home occupation" or otherwise be employed by the occupation; at most 25% of the floor area within a home can be dedicated to a home occupation; there can be "no external evidence of the existence of a home occupation"; no "goods or services of any kind" can be "transferred" to a "consumer or client" on the premises of the home occupation; and home occupations can create no "noise" or "vibration."

39. The Declaration authorizes Recreation Areas within the community to include any facilities used for "Recreational Purposes," which are defined as "any … open spaces or facilities utilized or intended for use for recreational or social purposes and amenities associated therewith." Recreational facilities include "clubhouses" that contain "restaurant facilities," "bowling facilities" or "theaters."

40. The Declaration authorizes the HOA to lease recreation areas to third-party operators who may charge for services. A third-party operator who charges for use of these facilities is not considered to engage in a "commercial activity" under the Declaration.

41.    Pursuant to this exception in the Declaration's commercial ban, the Developer of Loggers' Run allowed construction of multiple churches in Loggers' Run.

42.     Other than the Commercial Ban, the HOA's Land-Use Documents do not regulate the activities of residents inside the home that are not apparent from outside the home.

43.     Residential and Recreational Areas represent all space within Loggers' Run that could be suitable for religious facilities and use.

### The Synagogue Proposal

44.     The Hertzels provide the only religious services for Orthodox Jews in a six-mile radius in West Boca Raton, Florida. For the Orthodox Jewish community, walkable proximity to a synagogue is essential, as their sincerely held religious beliefs prevent them from driving to religious services on the Sabbath and Jewish holidays.

45.     The congregation has met for Chabad services and for other religious events and gatherings at the Hertzels' home and at a nearby storefront. The size of these venues has limited and continues to limit the congregation and inhibits proper practice of religious services.

46.     To establish an appropriate location to worship and live within the community as Jews, the Hertzels and other members of the Chabad wished to build a dedicated synagogue building to serve the Jewish community in Loggers' Run.  In 2012, the Hertzels began developing preliminary designs and plans to build a synagogue at 21995 Judge Winikoff RD, Boca Raton, Florida 33428 (the "Synagogue Land") based on discussions with some current members of the HOA Board.

47.     The Hertzels began meeting with current and former board members about what steps would be necessary to acquire land for the synagogue.

48.     The Hertzels met with Rodni Smith ("Smith"), a former HOA President. Smith expressed receptiveness to their proposal to acquire land for a synagogue and gave guidance on how to prepare a formal proposal.

49.     The Hertzels also spoke about establishing a synagogue with Robert Storch, Richard Green, Norman Defusco, and Robert Lawrence, then members or former officers of the HOA Board. Each provided guidance to the Hertzels regarding how best to develop the proposal.

50.     These HOA board members asked the Hertzels to develop a proposal detailing the plans for the Synagogue Land to present to the HOA Board.

51.     The HOA board members explained that they could not sell the land without a full HOA-membership vote, but they could transfer the land without a vote either as a long-term lease or as a gift. To enable such a trade, the HOA board members asked the Hertzels to incorporate in their plan a community center for broader use by the HOA, including a center for disabled children. The Chabad would pay to construct the additional buildings, which would then be available for the full community's use.

52.     Plaintiffs engaged in the painstaking process of preparing a viable proposal that aligned with the HOA board members' guidance. By 2015, the Hertzels had prepared a second iteration of the proposal, which included the synagogue and additional buildings that the Chabad would not use but was willing to build to benefit the HOA community. Plaintiffs proposed acquiring the Synagogue Land, which is a short walk from the House and many other Jewish residents and within HOA property. The land is also located near churches in Loggers' Run where sizable Christian congregations meet weekly. A meeting place for Orthodox Jews presents no unique issue compared to these and other houses of worship.

53.     The HOA Board never considered the Hertzels' proposal. In order for the proposal to receive a vote, HOA rules required a board member to make a motion to raise the proposal and seek a second to place it on the meeting agenda for a vote. During one meeting, Henya requested that a member formally make a motion, but, to Henya's surprise, the board members would not.

54.     Instead, the Hertzels' formal proposal to build a synagogue triggered a decline in their relationship with the HOA that has since devolved into ongoing, open antisemitism and discrimination.

55.     Following the refusal to consider the proposal, the Hertzels requested a meeting with Loggers' Run's attorney Louis Caplan and members of the HOA Board. During that meeting, Caplan explained to the Hertzels that the HOA Board "didn't want Jews" in Loggers' Run.

56.     In 2018, the Hertzels attempted once again to build a synagogue by submitting a confidential Letter of Interest to purchase the land.  The HOA ignored the proposal.

57.     The HOA pretextually backfilled its refusal to even consider a synagogue as based on the Declaration, which ostensibly precluded the development of a synagogue.

58.     Multiple church buildings exist on property within the HOA. Board members of the HOA attend these Churches.

59.     No synagogue buildings exist within Loggers' Run.

60.     Harp approached Henya in October 2023, and when Henya mentioned the possibility of building a synagogue, he said the Hertzels would "never" have a synagogue in Loggers' Run, and, if they did, it would be "over his dead body."

61.     In 2024, the HOA maintained its pretextual excuse regarding the synagogue in response to inquiries from the Hertzels, stating that the Declaration precluded the construction of a synagogue.

### The HOA Elections

62.     When it became clear that the HOA Board intended to continue to block the Hertzels and the Chabad from access to land for a synagogue, the Chabad members focused their efforts on running for the HOA Board. Defendants consistently prevented them from campaigning and seeking election on equal terms.

63.     Several Chabad members decided to run for the HOA Board in the February 2017 board election. The Chabad candidates had enough support at the election meeting to win election onto the HOA Board.

64.     When it became apparent that Chabad members had enough votes to join the board, Defendants and other HOA board members walked out of the meeting to deny a quorum. Some members who had not yet arrived to the meeting declined to attend.

65.     Because many of the members who left represent all the proxy votes in their gated communities, their decision to leave was dispositive in denying a quorum under HOA rules requiring representation from various neighborhoods. There was a motion to adjourn to a later date, but the vote failed.

66.     Since the HOA Board never adjourned to a later date and because there was no quorum, no annual meeting and election took place. This resulted in holding over the existing HOA Board membership until the next annual meeting and election.

67.     During the 2018 election, Harp campaigned specifically against the election of Jews, using HOA resources to generate opposition among Loggers' Run residents. In his position as HOA President, Harp used the HOA email list to encourage HOA residents not to vote for the Jewish candidates. Defendants denied requests by Chabad candidates to access that email list to promote their candidacy.

68.     In 2019, before the list of candidates was publicly announced, an anonymous letter was delivered to the HOA community urging voters to oppose the Chabad candidates by name. The letter asked: "IS IT A COINCIDENCE THAT SINCE OUR BOARD OF GOVERNORS DECLINED ICC SYNAGOGUE'S PROPOSAL THAT THEY ARE NOW ATTEMPTING TO

GAIN 5 SEATS ON OUR BOARD?" The letter urged that residents "NEED TO VOTE AND RE-ELECT OUR CURRENT BOARD MEMBERS."  Ex. A.

69.    On information and belief, a member of the HOA Board sent this message to the community. At the time the letter was sent, the list of candidates was not publicized and was known only by members of the HOA Board, Dietz, and Bob Bernhardt (employed by the Management Company as property manager).

70.    Likewise, in the lead-up to the 2023 election, Harp went door-to-door to neighbors urging them to vote against the Chabad candidates in the preliminary gated community election. He campaigned saying that the "Jews are trying to take over" and to not vote for them.

71.    Another anonymous letter was sent to Loggers' Run residents before the election saying that "IF YOU CAN 'READ BETWEEN THE LINES' YOU CAN SEE HOW CRITICAL YOUR VOTE IS TO RETAIN OUR CURRENT BOARD AND PREVENT A HOA BOARD 'TAKEOVER.'"  Ex. B.

72.    During the same HOA campaign, Harp continued to encourage residents of Loggers' Run to not vote for Jewish candidates. While the Hertzels' youngest daughter and her friend, the daughter of another Chabad leader, were collecting signatures for the Jewish candidates, one of Harp's neighbors screamed at them, calling the young children "dirty Jew[s]."

73.    Due to the HOA's interference and antisemitic invective, the Chabad candidates were unsuccessful in their attempts to run again in 2017, 2018, 2019, and 2023.

## The Chabad House

74.    Stonewalled by the HOA's refusal to consider a synagogue and its antisemitic campaign to prevent their participation on the HOA, the Hertzels purchased the Chabad House as an alternative location to serve the community.

75.     The Hertzels planned for an assistant rabbi to live in the Chabad House and minister to Jews in Loggers' Run.

76.     The Hertzels also planned to use the Chabad House as a location for the congregation to worship and meet.

77.     They did not anticipate any issues with these uses of the Chabad House, as an immediately adjacent neighbor uses his home to host weekly Christian services and studies.

78.     Within a week of the sale of the Chabad House, the Hertzels received a notice from the HOA that the house was in violation of HOA rules regarding house paint and that they would need to repaint it.

79.     The Hertzels sent a letter to certain members of the community to fundraise for the Chabad. The letter explained the group, its purpose, and examples of its programming.

80.     Shortly after sending the letter, the Hertzels and Chabad received a letter from counsel for the HOA stating that the use of the Chabad House for religious events was purportedly an anticipatory breach of various Loggers' Run HOA rules. The letter threatened legal action against the Hertzels if they used the Chabad House as planned. Ex. C.

81.     After the Hertzels concluded that the Chabad had the right to host private services in the Chabad House, they sought approval from the HOA to enlarge the driveway, which would help prevent vehicular traffic from obstructing roadways, and to add a patio to the house, which would help attract an assistant rabbi.

82.     For varying and pretextual reasons, such as failing to meet the HOA's driveway measurement requirements or standards for structures at the home by one inch or using a slight variation of approved driveway material that have not been enforced against similarly situated residents, the HOA denied the Hertzels' repeated requests to update the driveway and patio over

the next several months. The Hertzels eventually ceased attempting to build a patio and focused on obtaining HOA approval for the driveway.

83.     The Hertzels and Chabad were forced to divert resources into seeking legal counsel and eventually sent the HOA notice that they planned to file a lawsuit over the unwarranted denials of their applications regarding the driveways.

84.     The HOA finally granted approval to the Hertzels after months of applications, which led the Hertzels to construct the driveway according to the specifications in the (approved) application.  The Hertzels did not end up filing the lawsuit.

85.     Having induced the Hertzels to alter the driveway, the HOA then began sending the Hertzels notices that their new driveway violated HOA regulations because it extended to the left side of the garage further than permitted and for other pretextual reasons.

86.     When the Hertzels inquired about the HOA's selective enforcement of their property when similar rules had not been enforced against their neighbors, Dietz informed the Hertzels that the HOA was focused on them.

87.     During one interaction with Dietz, the Hertzels and Dietz argued about the driveway in front of the Hertzels' Home.  Shockingly, Dietz told Rabbi Hertzel that "they should have ended your kind in the 1930s."

88.     The Hertzels ultimately determined that fighting the HOA and its members to enjoy their right to host the Chabad and house a Jewish Rabbi at the Chabad House would be cost prohibitive and, as a practical matter, unlikely to succeed. They decided to sell the Chabad House less than a year after purchasing it.

89.     At the time they listed the house, the HOA had still not approved the driveway. The HOA ignored the Hertzels for weeks as their counsel attempted to contact the HOA to resolve any issues with the driveway.

90.     The Hertzels received an offer from a Jewish buyer shortly after listing their home.  The HOA still refused to engage with the Hertzels in good faith to approve the driveway despite increasingly frantic requests from the Hertzels' counsel. The buyer ultimately withdrew because of the outstanding problems with HOA approval.

91.     The HOA approved the driveway only after the Hertzels' counsel informed the HOA that a lawsuit would be filed within the next 24 hours.

92.     The Hertzels removed the listing and rented the Chabad House to a tenant before ultimately selling the house for more than $200,000 less than the initial offer they had received.

93.     In lieu of using the Chabad House, the Chabad has been relegated to continuing to rent a storefront for their meetings at considerable expense to the Chabad.  The Chabad has been forced to close the Hebrew School it operated due to a lack of space and resources.

### Defendants' Antisemitic Retaliation Campaign and Hostile Environment

94.     Alongside their stonewalling of the Chabad's election campaigns, synagogue, and attempts to use (and sell) the Chabad House, Defendants began to persecute the Hertzels and other Orthodox Jews by taking formal actions to harass them in and around their own home.

95.     Despite not issuing violation notices to the Hertzels prior to their synagogue proposal, the HOA and its agents, including Harp and Dietz, began sending a series of violation notices to the Hertzels for purported violations without citing similarly situated neighbors for materially identical violations.

17

96.   Defendants cited the Hertzels about the types of materials used on a driveway, even though the houses around them in the neighborhood use a wide variety of building materials and colors in their driveways without penalty or interference from the HOA.

97.   Defendants sent the Hertzels a notice about an unauthorized structure in their lawn when they put up a Sukkot for a religious event, but, during this time, the HOA did not cite the Hertzels' immediate neighbors for having an unauthorized chicken coop in their yard.

98.   Defendants sent notices about the way the Hertzels paint their mailbox, move their trash, clean their driveway, mow their lawn and fix their gate while ignoring similar violations by similarly situated residents.

99.   Despite Florida law allowing residents to worship in private homes, the HOA and its members have repeatedly cited the Hertzels with violations when they host religious gatherings at their home. Similarly situated neighbors and other residents of Loggers' Run host materially identical Christian meetings in their homes on a weekly basis without citation. Indeed, a local Christian church meets regularly in a home directly beside the Hertzels.

100.   In addition to formal citations and denials, Plaintiffs are subject to continuous surveillance and questioning of the enforcement division.

101.   When Henya approached Dietz to inquire about the citations and approval issues and point out that the HOA was failing to enforce its rules against similar violations by similarly situated residents, Dietz told Henya that the HOA was focused on the Hertzels.

102.   The HOA and its members have also denied the Hertzels use and enjoyment of community property and resources in the neighborhood. The HOA and Harp have regularly refused to let Henya participate in HOA meetings on equal terms with other residents.

103.    For example, in 2023, when the Hertzels tried to place an article in the HOA newsletter re-introducing themselves to their neighbors to reduce tensions against Jews in the neighborhood—an amenity that is typically free to dues-paying residents—Defendants rejected the article. When Henya spoke to the HOA Board about it,  Defusco said that the "Jews were trying to get a freebie." The Hertzels eventually were forced to publish their message as a paid advertisement.

104.    Despite previously publishing notices from the Hertzels and Chabad about the Chabad's annual Chanukah parade and lighting, the Management Company and HOA refused to do so in 2023, explicitly stating that it would not do so because the event was religious in nature.

105.    Defendants have amplified their harassment and retaliation against the Hertzels both by actively encouraging others to engage in hostile behavior within the HOA community and by declining to stop other abuse against Orthodox Jews residing in the neighborhood.

106.    For several years and in particular since the October 7, 2023 attack in Israel, Loggers' Run residents have harassed the Hertzels with antisemitic invective, including, for example, shouting outside their home, "heil Hitler," "the Jews think they can do whatever they want," and that "Jews should be exterminated."

107.    The Chabad's property has been vandalized multiple times. Vandals have broken windows at the storefront, spraypainted the building, and broken the Chabad's Hanukkah menorah and a mezuzah.

108.    Residents have threatened to run Jewish residents over as they play outside with their children, including the parking area in front of the Chabad's rented storefront location.

109.    During a recent visit to the Hertzels' home by guests from the Israeli consulate, a resident flew a drone over the building. Guests had to evacuate the home and premises because of the risk that the drone was a bomb.

110.    Neighbors have joined HOA board members in calling police on the Hertzels when they host large gatherings with other congregants at their Home for religious services and holidays. Defendants have coordinated with residents to amplify the harassing effect of HOA complaints, for example by scheduling meetings to address purported complaints by residents against the Hertzels during Jewish religious obligations to ensure that no Jews from the Chabad could attend.

111.    As a result of the distressing conduct and antisemitic harassment, the Hertzels are afraid for their safety in their own home and have been ostracized from the broader Loggers' Run community.

112.    The Hertzels' children are afraid to play outside and fear when cars drive past their home. Their youngest daughter has been confronted by other children in the neighborhood, and she now suffers from anxiety.  She cannot sleep alone and is especially afraid when Rabbi Hertzel leaves to travel.

113.    The Florida Division of Emergency Management issued a security grant to the Hertzels to protect their home by installing a security system, cameras, impacted windows, and a gate around the property. Ex. D. The security grant also included funds for the Hertzels to hire a security guard for the Chabad events that they host at the home.

**Pre-Litigation Proceedings**

114.    All conditions precedent to this action have been satisfied or waived.  On December 14, 2023, the Hertzels, through counsel, sent a letter to the HOA demanding a substantive response and inviting the HOA and its members to engage in mediation, citing Fla. Stat. § 720.311.

115.   On December 29, 2023, counsel for the HOA responded that it intended to provide a substantive response and agreed to participate in pre-suit mediation. The HOA requested a more detailed mediation request. Ex. E.

116.   On January 4, 2024, the Hertzels responded with a letter proposing five mediators and providing further information on each. Ex. F.

117.   The HOA accepted one of the Hertzels' proposed mediators. It never provided a substantive response to the Hertzels' demand letter.

118.   The parties conducted a pre-suit mediation on April 15, 2024. Several members of the HOA Board, including Harp, and a representative of the Management Company were present. No settlement was reached.

## COUNT I — 42 U.S.C. § 1982
### (Deprivation of Property Rights)

119.   Plaintiffs restate and re-allege paragraphs 1–11, 14–32, and 44–113 as though fully set forth herein.

120.   42 U.S.C. § 1982 guarantees that "[a]ll citizens of the United States shall have the same right, in every State and Territory … to inherit, purchase, lease, sell, hold, and convey real and personal property."  This provision broadly prohibits discrimination in the use and enjoyment of property rights, including community resources and benefits. It extends to discrimination against Jews.

121.   The HOA, Harp, and Dietz intended to subject Plaintiffs to racial discrimination on the basis of race in knowing violation of § 1982. As detailed, they exemplified this animus both through direct statements regarding their discriminatory intent and through selective and unfavorable treatment of Plaintiffs. When the Hertzels and other Jewish members of the Chabad sought election to the HOA Board to protect their property interests, Harp and other Board

members whipped residents of Loggers' Run into an antisemitic frenzy by openly campaigning against electing Jews, sending letters asking residents to "read between the lines," and warning residents that the "Jews are trying to take over." The HOA Board made clear that they "did not want religious Jews" there. When the Hertzels simply wanted to renovate the Chabad House to facilitate housing for an assistant rabbi and religious worship, the HOA immediately sprang into action to prevent the Hertzels from doing so. Dietz told the Hertzels that the HOA was only looking at them and harkened to Nazi Germany.

122.    The HOA's, Harp's, and Dietz's racial discrimination against Plaintiffs was intended to and has interfered with the rights and benefits connected to Plaintiffs' ownership and use of property. This discrimination has prevented Plaintiffs from enjoying community facilities, resources, and services on equal terms with non-Jewish residents and owners; equal use of the HOA's governance structure and resources; and the use, enjoyment, and development of property they own free from interference from Defendants.

123.    The Management Company and HOA are responsible for the actions of their agents in furtherance of this violation, including the actions of Dietz.

124.    Plaintiffs have been severely injured by Defendants' intentional and invidious discrimination.

**COUNT II— Fair Housing Act ("FHA")**
**(Disparate Treatment)**

125.    Plaintiffs restate and re-allege paragraphs 1–11, 14–32, and 44–113 as though fully set forth herein.

126.    The FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race" or "religion."  42 U.S.C. § 3604(b).  This provision extends to actions

limiting the use of privileges, services or facilities associated with a dwelling because of race or religion. It also protects against discrimination related to the use and enjoyment of housing and residential resources, including HOA governance, as well as the rights, privileges, and restrictions Loggers' Run residents hold by virtue of agreeing to live in the community, which are terms and conditions of property sale and use in Loggers' Run.

127.    Residences in Loggers' Run are purchased subject to the condition that the HOA has authority to enact rules and make land-use decisions that restrict their rights. Residing in Loggers' Run provides privileges to use common spaces and services operated and provided by the HOA.

128.    The HOA, as well Harp, and Dietz acting in their official and individual capacities, denied Plaintiffs equal use of the services provided to residents and owners of Loggers' Run by selectively enforcing rules, selectively withholding approval for home improvements, denying Plaintiffs equal use of common areas and resources as their neighbors, and denying them quiet use and enjoyment of their property free from harassment and surveillance.

129.    The HOA and Management Company also explicitly discriminated against Plaintiffs on the basis of religion by refusing to publicize or support events or uses of property that are religious in nature.

130.    Defendants intentionally subjected Plaintiffs to this discrimination on the basis of ethnicity and religion in knowing violation of the FHA. As detailed above, they exemplified this animus both through direct statements regarding their discriminatory intent and through their selective and unfavorable treatment that similarly situated residents did not experience.

131.    The Management Company and HOA are responsible for the actions of their agents in furtherance of this violation, including the actions of Dietz.

132.   Plaintiffs have been severely injured by Defendants' intentional and invidious discrimination.

## COUNT III— Fair Housing Act ("FHA")
### (Facial Discrimination)

133.   Plaintiffs restate and re-allege paragraphs 1–11, 14–61, 74–93, 99, as though fully set forth herein.

134.   The FHA prohibits HOA policies that facially discriminate on the basis of a protected status. 42 U.S.C. § 3604(b). A policy facially discriminates in violation of § 3604(b) when it classifies on the basis of a protected status and imposes disfavored treatment on the basis of that classification.

135.   By classifying religious facilities and religious uses of property as commercial and then banning commercial facilities and uses from Residential and Recreational Areas, the Declaration and Rules facially classify on the basis of religion and impose unfavorable treatment based on that status.

136.   The Declaration and Rules do not impose similarly disfavored treatment on comparable secular uses of Residential Areas, including hosting barbecues, book clubs, sleepovers, birthday parties, and other social events.

137.   The Declaration and Rules do not impose similarly disfavored treatment on comparable secular uses of Recreational Areas, including operating a restaurant, theater, or bowling alley on recreational property.

138.   By imposing disfavored treatment based on religious status that is not imposed on comparable secular activities, the Declaration and Rules discriminate on the basis of religion.

24

139.    The HOA, Harp, and Dietz have enforced these discriminatory provisions against Plaintiffs. Plaintiffs have been severely injured by the actual and threatened enforcement of these discriminatory provisions.

140.    Plaintiffs have had and continue to have a real interest in using their home for additional religious events and practices. Plaintiffs would do so but for Defendants' discriminatory policies and enforcement related to Residential Areas.

141.    Plaintiffs have had and continue to have a real interest in proposing a plan to construct a synagogue within Loggers' Run to the HOA Board and working with the HOA to construct that building. Plaintiffs would do so but for the HOA's stated intent to continue relying on its discriminatory policies, which make any attempt to do so futile.

142.    Plaintiffs have held and hold a credible fear of discriminatory enforcement based on Defendants' past discriminatory enforcement of provisions against them and statements reflecting antisemitic animus.

143.    The Management Company and HOA are responsible for the actions of their agents in furtherance of this violation, including the actions of Dietz.

### COUNT IV— Fair Housing Act ("FHA")
### (Hostile Housing Environment)

144.    Plaintiffs restate and re-allege paragraphs 1–11, 14–32, and 57–113 as though fully set forth herein.

145.    The Fair Housing Act prevents discrimination in housing that creates a hostile housing environment, including discrimination by homeowners' associations. *See Fox v. Gaines*, 4 F.4th 1293, 1296–97 & n.6 (11th Cir. 2021).

146.    Plaintiffs have suffered an extended hostile housing environment that involves a breathtaking array of harassment that includes slurs, threats, vandalism, refusal to allow entry to

meetings, calls to police during religious gatherings, and the campaign of selective enforcement and approval. This harassment has been severe, pervasive, and sustained, subjecting Plaintiffs to a hostile environment in their community of fifteen years.

147.   As discussed above, the HOA, Harp, and Dietz have intentionally fostered a hostile housing environment through their own ongoing harassment against Plaintiffs because of their Jewish ethnicity and adherence to the Orthodox Jewish faith. The HOA, Harp, and Dietz have also at varying times coordinated with, encouraged, and motived harassment by other Loggers' Run residents against Plaintiffs on the basis of race and religion. The HOA, Harp, and Dietz have likewise taken actions to prevent Plaintiffs from mitigating tensions within the community and have failed to take actions within their authority to prevent further harassment.

148.   The Management Company and HOA are responsible for the actions of their agents in furtherance of this violation, including the actions of Dietz.

149.   This harassment has been severe, pervasive, and sustained. It has altered the terms and conditions of housing and created a discriminatorily abusive housing environment for Plaintiffs, who have been severely damaged by the environment.

### COUNT V— Fair Housing Act ("FHA")
### (Interference and Retaliation)

150.   Plaintiffs restate and re-allege paragraphs 1–11, 14–32, and 44–113 as though fully set forth herein.

151.   The FHA makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section … 3604."  42 U.S.C. § 3617.  This provision extends to interference with persons in their enjoyment of a dwelling because of race.

152.    Defendants' discrimination against the Hertzels because of their Jewish ethnicity and their Orthodox Jewish faith has interfered with Plaintiffs' enjoyment of their home and the Chabad House. The Hetzels' everyday tasks and religious practices are now severely inhibited by both the actual harassment they endure and also the fear of another potential HOA citation or the denial of requests to use and develop their property.

153.    Defendants' discrimination and retaliation has interfered with Plaintiffs' efforts to expand the Jewish community in Loggers' Run and facilitate the free exercise of Orthodox Judaism in the community. The denial of approvals to alter the Chabad House to serve the Chabad precluded a new Jewish rabbi from inhabiting the Chabad House. And because of the limited capacity of the Chabad's existing facilities, it also has discouraged other Jews from moving to Loggers' Run. The discrimination also subsequently interfered with the Chabad Organization's ability to sell the home to a Jewish buyer as outstanding fines and permitting disputes precluded closing on a written offer for sale.

154.    Defendants intentionally interfered with Plaintiffs' property rights due to their discriminatory animus against Jews and adherents of Orthodox Judaism and in retaliation against Plaintiffs for exercising their property rights to petition for a synagogue, to improve their property, to encourage Jews to move into the community, and to use and enjoy their property and homes in Loggers' Run.

155.    The Management Company and HOA are responsible for the actions of their agents in furtherance of this violation, including the actions of Dietz.

156.    Plaintiffs have been severely injured by Defendants' intentional and invidious discrimination in furtherance of this knowing violation.

## COUNT VI— Florida Fair Housing Act ("FFHA")
### (Disparate Treatment)

157.    Plaintiffs restate and re-allege paragraphs 1–11, 14–32, and 44–113 as though fully set forth herein.

158.    The FFHA makes it "unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race," or "religion." Fla. Stat. § 760.23(2).

159.    Residences in Loggers' Run are purchased subject to the condition that the HOA has authority to enact rules and make land use decisions that restrict their rights. The HOA's governance, as well as the rights, privileges, and restrictions Loggers' Run residents hold by virtue of agreeing to live in the community, are thus terms or conditions of property sale and use in Loggers' Run.

160.    The HOA, as well as Harp and Dietz acting in their official and individual capacities, denied Plaintiffs of equal use of the services provided to residents and owners of Loggers' Run by selectively enforcing rules, selectively withholding approval for home improvements, denying Plaintiffs equal use of common areas and resources as their neighbors, and denying them quiet use and enjoyment of their property free from harassment and surveillance.

161.    The HOA and Management Company also explicitly discriminated against Plaintiffs on the basis of religion through their policies refusing to publicize or support events or uses of property that are religious in nature.

162.    Defendants intentionally subjected Plaintiffs to this discrimination on the basis of ethnicity and religion in knowing violation of the FFHA. As detailed above, they exemplified this animus both through direct statements regarding their discriminatory intent and through their selective and unfavorable treatment that similarly situated residents did not experience.

163.    The Management Company and HOA are responsible for the actions of their agents in furtherance of this violation, including the actions of Dietz.

164.    Plaintiffs have been severely injured by Defendants' intentional and invidious discrimination.

### COUNT VII— Florida Fair Housing Act ("FFHA")
### (Facial Discrimination)

165.    Plaintiffs restate and re-allege paragraphs 1–11, 14–61, 74–93, 99 as though fully set forth herein.

166.    The FFHA prohibits HOA policies that facially discriminate on the basis of a protected status. Fla. Stat. § 760.23(2). A policy facially discriminates in violation of § 760.23(2) when it classifies on the basis of a protected status and imposes disfavored treatment on the basis of that classification.

167.    By classifying religious facilities and religious uses of property as commercial and then banning commercial facilities and uses from Residential and Recreational Areas, the Declaration and Rules facially classify on the basis of religion and impose unfavorable treatment based on that status.

168.    The Declaration and Rules do not impose similarly disfavored treatment on comparable secular uses of Residential Areas, including hosting barbecues, book clubs, sleepovers, birthday parties, and other social events.

169.    The Declaration and Rules do not impose similarly disfavored treatment on comparable secular uses of Recreational Areas, including operating a restaurant, theater, or bowling alley on recreational property.

170.    By imposing disfavored treatment based on religious status that is not imposed on comparable secular activities, the Declaration and Rules discriminate on the basis of religion.

171.   The HOA, Harp, and Dietz have enforced these discriminatory provisions against Plaintiffs. Plaintiffs have been severely injured by the actual and threatened enforcement of these discriminatory provisions.

172.   Plaintiffs have had and continue to have a real interest in using their home for additional religious events and practices that are otherwise prohibited by these discriminatory rules. Plaintiffs would do so but for these discriminatory policies.

173.   Plaintiffs have had and continue to have a real interest in proposing a plan to construct a synagogue within Loggers' Run to the HOA Board and working with the HOA to construct that building. Plaintiffs would do so but for the HOA's stated intent to continue relying on its discriminatory policies, which make any attempt to do so futile.

174.   Plaintiffs have held and hold a credible fear of discriminatory enforcement based on the HOA, Harp, and Dietz's past discriminatory enforcement of provisions against them and Defendants' statements reflecting antisemitic animus.

175.   The Management Company and HOA responsible for the actions of their agents in furtherance of this violation, including the actions of Dietz.

### COUNT VIII— Florida Fair Housing Act ("FFHA")
### (Hostile Housing Environment)

176.   Plaintiffs restate and re-allege paragraphs 1–11, 14–32, and 57–113, as though fully set forth herein.

177.   The FFHA prevents discrimination in housing that creates a hostile housing environment, including discrimination by homeowners' associations.

178.   Plaintiffs have suffered an extended hostile housing environment that involves a breathtaking array of harassment that includes slurs, threats, vandalism, refusal to allow entry to meetings, calls to police during religious gatherings, and the campaign of selective enforcement

and approval. This harassment has been severe, pervasive, and sustained, subjecting Plaintiffs to a hostile environment in their community of fifteen years.

179.   As discussed above, the HOA, Harp, and Dietz have intentionally fostered a hostile housing environment through their own ongoing harassment against the Hertzels and Chabad because of their Jewish ethnicity and Orthodox Jewish faith. The HOA, Harp, and Dietz have also at varying times coordinated with, encouraged, and motived the actions of other Loggers' Run residents harassing Plaintiffs on the basis of race and religion. Defendants have likewise taken actions to prevent the Hertzels from mitigating tensions within the community and have failed to take actions within their authority to prevent further harassment.

180.   This harassment has been severe, pervasive, and sustained. It has altered the terms and conditions of housing and created a discriminatorily abusive housing environment that has severely damaged Plaintiffs.

181.   The Management Company and HOA are responsible for the actions of their agents in furtherance of this violation, including the actions of Dietz.

### COUNT IX— Florida Fair Housing Act ("FFHA")
### (Land Use and Permitting Discrimination)

182.   Plaintiffs restate and re-allege paragraphs 1–11, 14–61, and 74–102 as though fully set forth herein.

183.   The FFHA makes it "unlawful to discriminate in land use decisions or in the permitting of development based on race" or "religion." Fla. Stat. § 760.26.

184.   The HOA, Harp, and Dietz have enforced facially discriminatory land-use and development policies against Plaintiffs and have engaged in discriminatory enforcement of other policies on the basis of religion and race.

185.   By classifying religious facilities and religious uses of property as commercial and then banning commercial facilities and uses from Loggers' Run property, the Declaration and Rules facially classify on the basis of religion and impose unfavorable treatment based on that status.

186.   The Declaration and Rules do not impose similarly disfavored treatment on comparable secular uses of Recreational Areas, including operating a restaurant, theater, or bowling alley on recreational property.

187.   The Declaration and Rules do not impose similarly disfavored treatment on comparable secular uses of Residential Areas, including hosting barbecues, book clubs, sleepovers, birthday parties, and other social events.

188.   By imposing disfavored treatment based on religious status that is not imposed on comparable secular activities, the Declaration and Rules discriminate on the basis of religion.

189.   Plaintiffs have had and continue to have a real interest in proposing a plan to construct a synagogue within Loggers' Run to the HOA Board and working with the HOA to construct that building. Plaintiffs would do so but for the HOA's stated intent to continue relying on its discriminatory policies, which make any attempt to do so futile.

190.   Plaintiffs have had and continue to have a real interest in using their home for additional religious events and practices. Plaintiffs would do so but for Defendants' discriminatory policies and enforcement related to Residential Areas.

191.   Plaintiffs have held and hold a credible fear of discriminatory enforcement based on Defendants' past discriminatory enforcement of provisions against them and statements reflecting antisemitic animus.

192.    The HOA, Harp, and Dietz have likewise discriminated against the Hertzels by discriminatorily enforcing policies that restrict Plaintiffs' use and development of their property that Defendants do not enforce against similarly situated residents of Loggers' Run.

193.    The HOA, Harp, and Dietz discriminated against Plaintiffs on the basis of religion and race in denying the Hertzels' requests to improve the Chabad House so that the property was suitable to house a rabbi and host religious gatherings, all while allowing others in the community to host religious gatherings in their homes on a weekly basis.

194.    The HOA, Harp, and Dietz discriminated against Plaintiffs on the basis of religion and race in denying the Hertzels' requests to improve their own property and by citing Plaintiffs for violations of HOA rules related to property appearance and use that Defendants do not enforce against similarly situated residents.

195.    The HOA, Harp, and Dietz intentionally subjected Plaintiffs to this discrimination on the basis of religion and race in knowing violation of the FFHA. As detailed above, they exemplified this animus both through direct statements regarding their discriminatory intent and through their selective and unfavorable treatment that similarly situated residents did not experience.

196.    Plaintiffs have been severely injured by Defendants' enforcement of these discriminatory provisions and the threat of enforcement of these discriminatory provisions.

197.    The Management Company and HOA are responsible for the actions of their agents in furtherance of this violation, including the actions of Dietz.

### COUNT X— Florida Fair Housing Act ("FFHA")
### (Interference and Retaliation)

198.    Plaintiffs restate and re-allege paragraphs 1–11, 14–32, and 44–113 as though fully set forth herein.

199.    The FFHA makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise of, or on account of her or his having exercised, or on account of her or his having aided or encouraged any other person in the exercise of any right granted under" certain sections of the Florida Fair Housing Act.

200.    Defendants' discrimination against the Hertzels because of their Jewish ethnicity and their Orthodox Jewish faith has interfered with Plaintiffs' enjoyment of their home and the Chabad House. The Hertzels' everyday tasks and religious practices are now severely inhibited by both the actual harassment they endure and also the fear of another potential HOA citation or informal harassment by Defendants or neighbors.

201.    Defendants' discrimination and retaliation has interfered with Plaintiffs' efforts to expand the Jewish community in Loggers' Run and facilitate the free exercise of Orthodox Judaism in the community. The denial of approvals to alter the Chabad House to serve the Chabad precluded a new Jewish rabbi from inhabiting the Chabad House. And because of the limited capacity of the Chabad's existing spaces, it also has discouraged other Jews from moving to Loggers' Run due to the lack of availability of services. The discrimination also subsequently interfered with the Chabad Organization's ability to sell the home to a Jewish buyer as outstanding fines precluded closing on a written offer for sale.

202.    Defendants interfered with Plaintiffs' property rights due to their discriminatory animus against Jews and adherents of Orthodox Judaism and in retaliation against Plaintiffs for exercising their property rights to petition for a synagogue, to improve their property, to encourage Jews to move into the community, and to use and enjoy their property and homes in Loggers' Run.

203.    The Management Company and HOA are responsible for the actions of their agents in furtherance of this violation, including the actions of Dietz.

204. Plaintiffs have been severely injured by Defendants' intentional and invidious discrimination.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.  Declare that the HOA, the Management Company, Harp, and Dietz discriminated against Plaintiffs on the basis of race and religion in violation of Plaintiffs' civil rights under 42 U.S.C. § 1982, the Fair Housing Act, and the Florida Fair Housing Act;

B.  Declare that the HOA, the Management Company, Harp, and Dietz breached their obligations under the Declaration of Covenants to adhere to federal and state laws;

C.  Declare that, due to both the facially discriminatory nature of the provisions and the presence of religious buildings on HOA property, that any provisions in the Declaration or Rules that violate 42 U.S.C. § 1982, the Fair Housing Act, or the Florida Fair Housing Act are unenforceable;

D.  Issue a permanent injunction prohibiting Defendants from unlawfully interfering with the Plaintiffs' use or enjoyment of their property rights on the basis of race or religion;

E.  Issue a permanent injunction prohibiting Defendants from enforcing any blanket policy that discriminates against religion by excluding events, groups, or proposals from consideration on the basis of religion;

F.  Award Plaintiffs compensatory damages in an amount to be proven at trial for Defendants' actions;

G.  Award Plaintiffs punitive damages in an amount to be determined at trial for Defendants' actions;

H.  Award Plaintiffs the costs of this action and reasonable attorney's fees; and

I.  Award such other and further relief as it may deem just and proper.

**JURY DEMAND**

Plaintiffs demand trial by jury.

Dated April 17, 2025                                   Respectfully submitted,

                                                       /s/ *Eliot Pedrosa*

John C. Brinkerhoff Jr. (*pro hac vice*)               Eliot Pedrosa (FL Bar No. 182443)
JONES DAY                                              Priscilla Ruiz (FL Bar No. 1049927)
51 Louisiana Avenue, N.W.                              JONES DAY
Washington, DC 20001-2113                              600 Brickell Avenue, Suite 3300
Tel: (202) 879-3939                                    Miami, FL 33131
*jbrinkerhoff@jonesday.com*                            Tel: (305) 714-9717
                                                       *epedrosa@jonesday.com*

Jason Gonzalez (FL Bar No. 146854)
Bob Minchin (FL Bar No. 1033022)                       David J. Hacker (*pro hac vice*)
LAWSON HUCK GONZALES                                   Jeremiah G. Dys (*pro hac vice*)
215 South Monroe Street, Suite 320                     FIRST LIBERTY INSTITUTE
Tallahassee, FL 32301                                  2001 West Plano Parkway, Suite 1600
Tel: (850) 825-4334                                    Plano, TX 75075
*Jason@lawsonhuckgonzalez.com*                         Tel: (972) 941-4444
                                                       *dhacker@firstliberty.org*

*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this April 17, 2025, I electronically filed a true and correct copy of the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice of electronic filing to all parties at the email addresses on file with the Clerk of Court.

*/s/ Eliot Pedrosa*
Eliot Pedrosa